## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOSHUA FELIX,

      Plaintiff,

vs.

CITY OF DETROIT; MICHAEL
MCGINNIS; MARC DELUCA;
WILLIAM SIMS; JAMES WHITE;

      Defendants.

Case No. 25-11428
Hon. Terrence G. Berg

---

## FIRST AMENDED COMPLAINT & JURY DEMAND

**NOW COMES** Plaintiff, JOSHUA FELIX, by and through his attorneys, CHRISTENSEN LAW, and for his First Amended Complaint, pursuant to Fed. R. Civ. P. 15(a)(1)(A) given it was served on May 23, 2025, being filed within 21 days of service, against the above-named Defendants, hereby state as follows:

## PARTIES

1.      At all times relevant to this lawsuit, Plaintiff Joshua Felix (herein "Plaintiff") was a resident of the City of Detroit, County of Wayne, and State of Michigan.

2.      Defendant City of Detroit operates the Detroit Police Department (herein "DPD"), was Plaintiff's employer at the times of all pertinent events and is an "employer" within the meaning of Title VII and the Elliott-Larsen Civil Rights Act.

3.      At all material times, Defendant JAMES WHITE was the Chief of Police of the City of Detroit at all pertinent times and was acting in his individual capacity and within the course and scope of his employment with the City of Detroit Police Department and is sued in his

individual capacity and also is individually named under the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2103(g).

4.      At all material times, Defendants MICHAEL MCGINNIS, MARC DELUCA and WILLIAM SIMS were employed by the City of Detroit and were acting in their individual capacity and within the course and scope of their employment with the City of Detroit Police Department and are sued in their individual capacity and also are individually named under the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2103(g).

5.      At all material times relevant to this lawsuit, Plaintiff was an employee, and Defendant DPD was his employer.

6.      This cause of action involves violations of Plaintiff's civil rights, as secured by the United States and Michigan Constitutions, and is brought pursuant to Title VII of the Civil Rights Act of 1964, the Elliott-Larsen Civil Rights Act and 42 U.S.C. § 1983.

7.      This Court has jurisdiction over the claims arising under federal law pursuant to 42 U.S.C. § 2000e-5(f), 29 U.S.C. § 623, and 28 U.S.C. §§ 1331 and 1343(a).

8.      Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3), § 2000e-6(b), and 28 U.S.C. § 1391(b) because it is where a substantial part of the events or omissions giving rise to the cause of action occurred.

9.      Plaintiff filed a charge of discrimination with the MDCR, asserting both ELCRA and Title VII violations as the MDCR has concurrent jurisdiction with the EEOC, on January 25, 2024.

10.     Plaintiff received a Right to Sue letter from the EEOC following its investigation on March 20, 2025.

11.     In bringing this suit, Plaintiff has satisfied all jurisdictional requirements as set forth by the EEOC for bringing employment discrimination suits.

## Factual Allegations

12.     Plaintiff, who is African American, began working for Defendant DPD as a police officer in November of 2009.

13.     At the time of all pertinent events, Plaintiff was a Sergeant assigned to the DPD's Office of Internal Affairs, specifically a sergeant in the DPD's Professional Standards Bureau.

14.     Prior to these events, Plaintiff was an exceptional employee with little to no discipline history.

15.     He was a detective in the Professional Standards Bureau from September of 2018 to June of 2020, received a promotion to Sergeant and was assigned to the Fifth Precinct from June of 2020 to November of 2020, and then was reassigned back to the Professional Standards Bureau in November of 2020, where he worked until these events.

16.     As a Sergeant and detective, Plaintiff's assignment to a blue-slip unit like the Professional Standards Bureau was one that would facilitate further career advancement as ranking detectives with that experience were highly valued for promotional opportunities within the department.

17.     On or around July 16, 2023, Plaintiff and a few other African American Internal Affairs ("IA") employees reported to the Lieutenants and Sergeants Association union ("LSA") that they believed that command staff—Lieutenant Marc DeLuca, Captain Williams Sims and Commander Michael McGinnis—were unlawfully using employee race to determine IA investigation assignments, and this resulted in Caucasian investigators being assigned favorable investigations whereas African American investigators were assigned less favorable assignments.

18.     Both DeLuca and McGinnis are Caucasian.

19.     On July 18, 2023, Commander McGinnis and Captain Sims held a meeting with the entire IA staff regarding this internal complaint, and it is upon information and belief they knew that Plaintiff either made the complaint or was part of it.

20.     During this meeting, Commander McGinnis specifically brought up the complaint, told the staff it was the type of the complaint that was toxic to the unit, and stated that he was told that the person who made the complaint is a "unit killer."

21.     It is upon information and belief that the decision to hold this meeting and include all personnel, including the complainant(s), was an attempt to publicly shame and intimidate the complainant and in violation of DPD policy.

22.     Following this complaint regarding the race-based treatment, Plaintiff began experiencing arbitrary selective enforcement from command staff, specifically but not limited to DeLuca and McGinnis.

23.     For example, on August 2, 2023, DeLuca emailed Plaintiff regarding a single case Plaintiff was investigating that was allegedly (and erroneously) missing information; this indicated that DeLuca was actively tracking Plaintiff's case load and looking for disciplinable conduct.

24.     Another incident occurred with DeLuca on or around August 11, 2023, where DeLuca questioned Plaintiff's activity log, and implied (again, erroneously) Plaintiff had falsified his activities; a disciplinable allegation and further proof of increased scrutiny and Plaintiff's reasonable belief he had a target on his back.

25.     On October 17, 2023, DeLuca, at the request of Commander McGinnis, gave Plaintiff a disciplinary action for "neglect of duty" erroneously alleging that Plaintiff failed to

4

timely investigate an IA investigation he had been assigned to Plaintiff on October 2 and had a due date of January 2, 2024.

26.     This October 17, 2023, discipline was baseless and part of the same series of retaliatory actions utilizing selective enforcement orchestrated by DeLuca and McGinnis.

27.     Following this meeting, Plaintiff informed Lt. Fredericks that he believed this discipline was retaliatory and that he was going to go to the Union office and file an EEO grievance.

28.     It is upon information and belief that Lt. Fredericks informed command staff, including Commander McGinnis, that Plaintiff was intending on filing an EEO complaint (a discrimination/retaliation complaint) regarding this discipline.

29.     Later that same day, October 17, Plaintiff went to the DPD's Union Offices and filed a grievance regarding the above conduct, specifically alleging harassment and retaliation.

30.     It is upon information and belief that DeLuca and McGinnis were aware of Plaintiff's grievance and the allegations against them by Plaintiff.

31.     On October 19, 2023, Plaintiff was called to a meeting with DeLuca and McGinnis, wherein McGinnis informed him that he was no longer fit to be part of Internal Affairs based on the arbitrary October 17 discipline.

32.     On or around October 20, 2023, DeLuca informed Plaintiff he was involuntarily transferred to the 10th Precinct.

33.     The decision to transfer Plaintiff came from DeLuca, McGinnis, Sims, and Chief James White and while this was facially a lateral transfer, Plaintiff's new unit was not a blue-slip unit, was far less prestigious and the work starkly different than his investigative work with IA,

and this placement significantly lessened Plaintiff's ability for career advancement within the DPD.

34.     Without any knowledge of Plaintiff's experience and/or ability, Chief White deemed Plaintiff not a "good fit" for force investigations at the Professional Standards Bureau.

35.     The Chief's decision occurred despite that while at Internal Affairs before these events, Plaintiff had not received a single disciplinary offense and was an exceptional investigator.

36.     On or around October 23, 2023, Plaintiff filed an EEO (DPD's internal discrimination/retaliation process) complaint asserting both discrimination and retaliation.

37.     On or around October 24, 2023, Plaintiff applied for a transfer to the Risk Management Unit ("RMU"), another blue-slip unit that he was qualified for given his investigative experience, and he also received a favorable endorsement from the Lieutenant in charge of the RMU.

38.     Following Plaintiff's transfer request, two different job openings became available at the RMU that would have satisfied Plaintiff's transfer request, yet he did not receive them.

39.     By way of refence, the RMU is also a Blue-Slip unit for investigators like Plaintiff, and experience there paves the way for career advancement.

40.     Due to the ongoing retaliatory harassment that Plaintiff continued to experience even while at the 10th Precinct, he took a furlough leave of absence from November 27, 2023, through December 11, 2023.

41.     When Plaintiff returned from furlough, he went to DPD's Medical Section and was placed on sick leave until he could be examined by a Department Psychiatrist, Dawn Reynolds.

42.     Following this psych evaluation, Dawn Reynolds conducted an evaluation of Plaintiff on December 20, 2023, and placed Plaintiff on medical leave based upon a finding that

he was not fit for duty due to the undue stress he experienced as a result of the above workplace conduct.

43.     Plaintiff remained on this medical leave until June 4, 2024.

44.     During his leave on January 25, 2024, Plaintiff filed a charge of discrimination with the MDCR (and EEOC under their work-sharing agreement) asserting both discrimination and retaliation claims under ELCRA and Title VII; something that the City received notice of shortly after.

45.     While on stress leave, Plaintiff's department therapist, Dr. Reynolds, received multiple communications from DPD management—in violation of department policies—regarding Mr. Felix, including asking about his return date and inquiring about the validity of his leave of absence.

46.     Plaintiff was made aware of these calls and attempts to interfere with this mental health, and this was intimidating and distressing.

47.     Plaintiff returned to work on June 4, 2024, yet took an authorized furlough until June 20, 2024.

48.     On June 17, 2024, Plaintiff emailed DPD Chief, James White, a complaint that reiterated his concerns about the IA command and race-based preferential treatment.

49.     Along with reiterating his race concerns to Chief White, Plaintiff also informed Chief White that DeLuca would interfere with IA investigations by instructing the subject officers—i.e. officers who were charged with misconduct and being investigated—what to say during their Garrity interviews to be found innocent and also assigning certain investigations to investigators who would ensure that the subject officer was not found guilty of any department violations.

50.     Put otherwise, Plaintiff opposed this conduct that amounted to Internal Affairs, specifically DeLuca, effectively fixing investigations of officer misconduct by improper influence and bias to ensure that the subject officers were cleared of wrongdoing.

51.     When Plaintiff returned to work on June 20, 2024, he found that his emails had been deleted from the server; this appeared retaliatory as the deleted emails included various complaints and forms of protected activity.

52.     On June 28, 2024, Plaintiff received a negative performance evaluation for the period of November 23, 2023-April 24, 2024, yet Plaintiff had been off work at that time.

53.     It is upon information and belief that performance evaluations play a role in both possible promotions and transfers, and by issuing him a negative performance evaluation, Defendants were littering Plaintiff's employment record with erroneous negative elements.

54.     On July 15, 2024, Plaintiff, while still at the unfavorable 10th Precinct, was reassigned to patrol duties; once again, a lateral move, but one that negatively impacted Plaintiff's resume and ability to advance his career in the DPD and altered his day-to-day schedule in a manner that affected his personal life.

55.     On July 26, 2024, Plaintiff had a meeting regarding his complaints at Defendant's EEO office, and in attendance at this meeting was Assistant Chief Eric Ewings, who oversaw the department's blue-slip unit process.

56.     During this EEO meeting on July 26, 2024, Plaintiff reiterated his underlying concerns about ongoing discrimination and retaliation, and specifically opposed how the Department was handling the investigation(s) into Plaintiff's complaint.

57.     Throughout July and August of 2024, Plaintiff was informed by coworkers that management was closely watching him, confirming the selective enforcement of rules and policies and increased scrutiny that Defendant was utilizing against Plaintiff.

58.     As Plaintiff had submitted grievances regarding his discipline and unit transfer that went to an arbitration hearing—limited to whether these actions adhered to the collective bargaining agreement—he testified at the arbitration hearing on September 24, 2024, regarding Defendants' unlawful treatment, harassment and retaliation discussed above.

59.     During this hearing and/or the prior investigation, it came to light that Chief James White had specifically met with Commander McGinnis regarding Plaintiff's transfer requests and the decisions ultimately rested with Chief White.

60.     While Plaintiff's 2023 transfer request to Risk Management was never officially denied, it was strangely never granted, appearing like Chief White had intentionally left it in limbo, and the request expired in October of 2024.

61.     Following the arbitration decision being issued on December 16, 2024, Plaintiff, through counsel, sent the City of Detroit Law Department a preservation and retention letter regarding an exhaustive list of evidence related to these events, and this was delivered on January 17, 2025.

62.     Specific to these claims, this letter informed the City that Plaintiff was pursuing civil rights violations.

63.     For a number of years, Plaintiff has owned a business in Detroit as secondary employment, and the Department has always had notice and approved this outside employment.

64.     But on March 21, 2025, Plaintiff received an undated letter from Assistant Chief of Police Charles Fitzgerald informing Plaintiff that "an investigation" revealed Plaintiff was

engaging in outside employment, that he needed to cease engaging in outside employment, he must notify the Chief of Police that he ceased his outside employment, and any failures of the above would result in "insubordination" and a suspension.

65. This letter also required Plaintiff to respond within three days—again, the letter was not dated—making it ambiguous at best as to when those three days accrued and setting up Plaintiff to be in violation of the letter regardless of his efforts to comply.

66. Conflicting with this letter, Plaintiff had been approved for his outside employment by both his immediate supervisor and commander on July 3 and July 15, 2024, respectively, and never heard anything about it since that time until this March 21, 2025 communication.

67. It is believed that this letter was another effort to intimidate, harass and set Plaintiff up to be in violation of DPD rules to effectuate discipline.

68. Since Plaintiff's initial complaint of improper race-based practices in July of 2023 and following each subsequent form of protected activity described above—from then-Chief White down to Plaintiff's immediate supervisors—Plaintiff has experienced increased scrutiny and hostility, including overt attempts to investigate him and track him while working, all of which intended to uncover and/or set him up with disciplinable conduct.

69. Defendants have selectively enforced numerous rules and regulations against Plaintiff, doing so to try and intimidate him and silence him from advancing these claims of unlawful conduct.

70. The selective enforcement and increased scrutiny of Plaintiff led to his medical leave along with his involuntary transfer to a non-blue-slip unit and has thwarted his career advancement in the DPD.

71.     The increased scrutiny and arbitrary treatment Plaintiff received following his opposition to discriminatory/retaliatory practices and civil rights violations has resulted in a significant emotional toll on Plaintiff.

72.     As a 17-year veteran of the DPD, while he has continued to work as he loves police work, his assignment at the non-blue slip 10th Precinct Detective Unit and denial of multiple transfer requests to other investigative blue-slip units has severely limited his career advancement and Defendants' unlawful efforts toward him.

## COUNT I – RACE DISCRIMINATION
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
## AS TO DEFENDANT DPD

73.     Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 72, as if fully set forth herein.

74.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. prohibits discrimination against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race.

75.     Title VII also prohibits creating a hostile work environment based on race as a form of discrimination.

76.     At all material times, Plaintiff was an employee of Defendant, covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

77.     Plaintiff is African American and is a member of a protected class under Title VII of the Civil Rights Act of 1964.

78.     As an employer within the meaning of the Title VII of the Civil Rights Act of 1964, Defendant owed Plaintiff a duty not to discriminate against him and/or create a hostile work

environment with respect to employment, promotional opportunities, compensation or other conditions or privileges of employment on the basis of Plaintiff's race.

79.     Because of his race, Plaintiff was subjected to treatment from Defendant that was disparate from that accorded to non-African American employees of Defendant who were treated more favorably than Plaintiff.

80.     This treatment consisted of unfavorable case assignments within Internal Affairs and arbitrarily transferring Plaintiff to a less favorable position that would stymie Plaintiff's future career advancement within the DPD.

81.     Plaintiff's race was at least one factor that made a difference in Defendant's decision to discriminate against and harass Plaintiff.

82.     Plaintiff's race was a factor that made a difference in Defendant's decision to treat Plaintiff differently than others, including but not limited to, failing to allow Plaintiff to do his job without being harassed, allowing offensive comments regarding Plaintiff's race to go unpunished, utilizing race as a basis to assign more difficult cases for investigation, transferring Plaintiff to a less favorable assignment, refusing to transfer Plaintiff to a blue-slip unit despite his qualifications and openings.

83.     As a result of this discrimination, Plaintiff took a medical leave of absence due to mental health.

84.     Had Plaintiff not been African American, he would not have been subjected to the above-referenced discriminatory treatment.

85.     The above-referenced harassing supervisors and individuals did not treat any similarly situated, non-African American individuals like they did Plaintiff.

86.     The disparate and less favorable treatment that Defendant subjected Plaintiff to included adverse employment actions on the basis of Plaintiff's race, amounted to a hostile work environment and Plaintiff has otherwise been discriminated against with respect to employment, promotional opportunities, compensation or other conditions or privileges of employment on the basis of his race.

87.     The disparate and less favorable treatment that Defendant subjected Plaintiff to came both from management, supervisory personnel, and from Plaintiff's coworkers.

88.     Defendant has a policy or pattern of practice that encourages management or supervisory personnel to directly discriminate against African American employees or that tolerates the disparate and less favorable treatment of the same employees by said management and supervisory personnel.

89.     Defendant has a policy or pattern of practice that encourages management or supervisory personnel to look the other-way or actively encourage disparate and less favorable treatment of African American employees by non-African employees and/or supervisory personnel.

90.     Management and/or Plaintiff's supervisors have either directly discriminated against Plaintiff or have tolerated and looked the other way to the disparate and less favorable treatment of Plaintiff by his non-African American co-workers and/or supervisory personnel.

91.     The disparate treatment to which Plaintiff was subjected while employed with Defendant was so substantially disparate and less favorable than the treatment of similarly-situated non-African American employees that it raises an inference of disparate treatment discrimination.

92.     Defendant's actions were intentional and in disregard for Plaintiff's rights and sensibilities.

93.     As a result of this discrimination, Plaintiff was ultimately arbitrarily disciplined, transferred to a unit that would stymie his career advancement and impacted his personal life, and harassed with arbitrary investigations and claims.

94.     As a direct and proximate result of Defendant's unlawful actions against Plaintiff as described herein, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity, loss of wages and benefits, loss of career opportunities, loss of reputation and esteem in the community, mental and emotional distress, and loss of the ordinary pleasures of life.

95.     By failing to take prompt and effective remedial actions but instead looking the other way, Defendant has in effect condoned, ratified, and/or authorized discrimination against Plaintiff and individuals similarly situated.

96.     Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant is liable to Plaintiff for all damages allowed under federal law. To the extent that the damages allowable and/or recoverable are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendant, this Court must order additional damages to be allowed so as to satisfy any and all such inadequacies. The conduct of Defendants was and remains extreme and outrageous subjecting Defendants to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendant in an amount that is fair and reasonable and compensates Plaintiff for her injuries, plus costs, interest, and attorney fees, as well as punitive and/or exemplary damages so wrongfully incurred.

## COUNT II – RETALIATION
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## AS TO DEFENDANT DPD

97.     Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 96, as if fully set forth herein.

98.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. prohibits retaliation against any individual because that person has opposed a violation of this act or because the person has made a charge, testified, assisted, or participated in any investigation…under this act.

99.     At all material times, Plaintiff has been an employee of Defendant DPD, covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

100.    As an employer within the meaning of the Title VII of the Civil Rights Act of 1964, Defendant DPD owed Plaintiff a duty not to retaliate against him on the basis of him engaging in statutorily protected activities.

101.    Complaining about, reporting, and/or opposing discriminatory and/or harassing treatment and/or policies or patterns of practice is a statutorily protected activity.

102.    Plaintiff engaged in conduct protected under Title VII of the Civil Rights Act of 1964, including, but not limited to filing complaints, grievances, emailing command staff, filing an MDCR/EEOC charge, testifying at his arbitration hearing and notifying the City, through counsel, of his intent to pursue civil rights claims, which consisted of complaining of, reporting, and/or opposing the discriminatory and/or retaliatory conduct of the agents, servants, and/or employees of Defendant DPD.

103.    Under information and belief, the subsequent harassing and arbitrary treatment Plaintiff experienced following his protected activity was meant to intimidate and deter him from making further or formal complaints of harassment, specifically from DeLuca, McGinnis and then-Chief James White.

104.    Defendant DPD, including the above-named individuals, had knowledge of Plaintiff's protected activities.

105.    Defendant DPD, by and through its agents, servants, and/or employees, subsequently took adverse, retaliatory action against Plaintiff including, but not limited to, bringing disciplinary actions without cause, harassing him, transferring him to a less-favorable unit that would stymie his career advancement, selectively monitoring him, denying meritorious transfers to other blue-slip units,  and denying Plaintiff conditions, terms, opportunities, and privileges of his employment because he engaged in the above referenced statutory protected activities in violation of Title VII of the Civil Rights Act of 1964.

106.    Defendant DPD and its agents, servants and/or employees' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

107.    Defendant's subsequent retaliation resulted in Plaintiff's reasonable and foreseeable medical leave of absence.

108.    As a direct and proximate result of Defendant's unlawful and retaliatory actions against Plaintiff as described herein, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity, loss of career opportunities, loss of reputation and esteem in the community, mental and emotional distress, and loss of the ordinary pleasures of life.

109.    Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., Defendant is liable to Plaintiff for all damages allowed under federal law. To the extent that the damages allowable and/or recoverable are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendant, this Court must order additional damages to be allowed so as to

satisfy any and all such inadequacies. The conduct of Defendant was and remains extreme and outrageous subjecting Defendant to all available damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant, jointly and severally in an amount that is fair and reasonable and compensates Plaintiff for his injuries, plus costs, interest, and attorney fees, as well as punitive and/or exemplary damages so wrongfully incurred.

**COUNT III**
**FIRST AMENDMENT RETALIATION**
**PURSUANT TO 42 U.S.C. § 1983**
**AS TO DEFENDANTS' DPD AND JAMES WHITE**

110.    Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 109, as if fully set forth herein.

111.    This action is brought pursuant to 42 U.S.C. § 1983 against Defendant James White (who is no longer Chief of Police but was at the time of these events) in his individual capacity, and against the City of Detroit pursuant to *Monell*.

112.    At all material times, Defendant James White was acting within the scope of his employment and/or color of law and therefore owed Plaintiff the duty to avoid a violation of his constitutionally guaranteed rights.

113.    For purposes of the First Amendment and Section 1983, Plaintiff engaged in protected activity when he emailed Chief White a letter on June 17, 2024, reporting civil rights violations within IA, including, but not limited to, Lt. DeLuca interfering with and influencing use-of-force investigations, instructing officers what to say during their Garrity interviews to be found innocent, and assigning certain investigations of officers he liked or had relationships with to investigators who he equally had relationships with in order to bias the investigations.

114.     Plaintiff's opposition to this conduct was a matter of public concern as the investigations pertained to allegations of unconstitutional conduct committed by DPD officers and by influencing the investigations to ensure the officers would be found innocent, negatively impacted the civil rights of citizens.

115.     Following this communication, Plaintiff received arbitrary treatment, promulgated by Chief White, including increased scrutiny, arbitrary investigations, and unfavorable position assignments, which are adverse action(s) for purposes of a 1983 retaliation claim.

116.     The adverse actions taken by Defendant White were done in his capacity as the head of DPD and he had final authority to make these decisions as Chief of Police under the City charter.

117.     Specifically, Defendant White is the sole individual employed by the DPD with the authority to grant or deny blue-slip transfers, and he prevented Plaintiff from obtaining any of the transfers he requested.

118.     Plaintiff's opposition of a matter of public concern occurred in close proximity to Defendant White's subsequent arbitrary treatment of Plaintiff and selective enforcement of rules and regulations.

119.     Because Defendant White was the highest-ranking employee at the DPD, he had unfettered discretion to inflict retaliation against employees such as Plaintiff, and his retaliation constitutes deliberate indifference and a custom/policy and was a motivating factor behind the adverse action.

120.     The Detroit Police Department for decades has had a de facto policy of protecting their own and punishing, albeit not overtly, officers who speak out like Plaintiff has done, and this

systemic problem is maintained by DPD leadership given individuals are promoted from within and individuals who toe the line and stay silent advance their careers.

121.    Defendant White's conduct was the proximate cause of the adverse actions and was done with intentional reckless indifference.

122.    Defendants' callous and repeated disregard for Plaintiff's rights rises to a level of deliberate indifference.

123.    That as a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and has suffered mental anguish, physical and emotional distress, humiliation, mortification and embarrassment, as well as loss of professional reputation.

124.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowed under federal law.  To the extent that the damages allowable and/or recoverable under one or both of the statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed so as to satisfy any and all such inadequacies.  The conduct of Defendants was and remains extreme and outrageous subjecting Defendants to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of $75,000.00, plus costs, interest, and attorney fees, as well as punitive and/or exemplary damages so wrongfully incurred, as the Court deems just.

## COUNT IV – RACIAL DISCRIMINATION
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT,
## M.C.L. § 37.2101 *et seq*., AS TO DEFENDANTS DPD, MCGINNIS, DELUCA AND SIMS

125.    Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 124, as if fully set forth herein.

126.    The Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* prohibits discrimination against any individual with respect to employment, compensation, or a term, condition, or privilege of employment because of race.

127.    At all material times, Plaintiff is and has been an employee of Defendant DPD, covered by and within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*

128.    Plaintiff is African American and is a member of a protected class under the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*

129.    The individual defendants are liable under ELCRA as agents of the DPD and involved actors with the discrimination/retaliation.

130.    As an employer within the meaning of ELCRA, Defendants owed Plaintiff a duty not to discriminate against him and/or create a hostile work environment with respect to employment, promotional opportunities, compensation or other conditions or privileges of employment on the basis of Plaintiff's race.

131.    Because of his race, Plaintiff was subjected to treatment from Defendants that was disparate from that accorded to non-African American employees of Defendant who were treated more favorably than Plaintiff.

132.    This treatment consisted of unfavorable case assignments within Internal Affairs and arbitrarily transferring Plaintiff to a less favorable position that would stymie Plaintiff's future career advancement within the DPD.

133. Plaintiff's race was at least one factor that made a difference in Defendants' decision to discriminate against and harass Plaintiff.

134. Plaintiff's race was a factor that made a difference in Defendants' decision to treat Plaintiff differently than others, including but not limited to, failing to allow Plaintiff to do his job without being harassed, allowing offensive comments regarding Plaintiff's race to go unpunished, utilizing race as a basis to assign more difficult cases for investigation, transferring Plaintiff to a less favorable assignment, refusing to transfer Plaintiff to a blue-slip unit despite his qualifications and openings.

135. As a result of this discrimination, Plaintiff took a medical leave of absence due to mental health.

136. Had Plaintiff not been African American, he would not have been subjected to the above-referenced discriminatory treatment.

137. The above-referenced harassing supervisors and individuals did not treat any similarly situated, non-African American individuals like they did Plaintiff.

138. The disparate and less favorable treatment that Defendants subjected Plaintiff to included adverse employment actions on the basis of Plaintiff's race, amounted to a hostile work environment and Plaintiff has otherwise been discriminated against with respect to employment, promotional opportunities, compensation or other conditions or privileges of employment on the basis of his race.

139. The disparate and less favorable treatment that Defendants subjected Plaintiff to came both from management, supervisory personnel, and from Plaintiff's coworkers.

140. Defendants had a policy or pattern of practice that encourages management or supervisory personnel to directly discriminate against African American employees or that

tolerates the disparate and less favorable treatment of the same employees by said management and supervisory personnel.

141.    Defendants had a policy or pattern of practice that encourages management or supervisory personnel to look the other-way or actively encourage disparate and less favorable treatment of African American employees by non-African employees and/or supervisory personnel.

142.    Management and/or Plaintiff's supervisors have either directly discriminated against Plaintiff or have tolerated and looked the other way to the disparate and less favorable treatment of Plaintiff by his non-African American co-workers and/or supervisory personnel.

143.    The disparate treatment to which Plaintiff was subjected while employed with Defendant was so substantially disparate and less favorable than the treatment of similarly-situated non-African American employees that it raises an inference of disparate treatment discrimination.

144.    Defendants' actions were intentional and in disregard for Plaintiff's rights and sensibilities.

145.    As a result of this discrimination, Plaintiff was ultimately arbitrarily disciplined, transferred to a unit that would stymie his career advancement and impacted his personal life, and harassed with arbitrary investigations and claims.

146.    As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described herein, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity, loss of wages and benefits, loss of career opportunities, loss of reputation and esteem in the community, mental and emotional distress, and loss of the ordinary pleasures of life.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants in an amount that is fair and reasonable and compensates Plaintiff for his injuries, plus costs, interest, and attorney fees, as well as punitive and/or exemplary damages so wrongfully incurred.

## COUNT V – RETALIATION
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, M.C.L. § 37.2101 *et seq*. AS TO ALL DEFENDANTS

147.    Plaintiff hereby reasserts and re-alleges each and every allegation contained in paragraphs 1 through 146, as if fully set forth herein.

148.    The Elliott-Larsen Civil Rights Act prohibits retaliation against any individual because that person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in any investigation … under this act. M.C.L. § 37.2701(a).

149.    At all material times, Plaintiff was an employee of Defendants covered by and within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

150.    The individual defendants are liable under ELCRA as agents of the DPD and involved actors.

151.    As an employer within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*., Defendants owed Plaintiff a duty not to retaliate against him with respect to his employment, promotional opportunities, compensation or other conditions or privileges of employment on the basis of Plaintiff engaging in protected activity.

152.    Complaining about, reporting, and/or opposing discriminatory and/or harassing treatment and/or policies or patterns of practice is a statutorily protected activity.

153.    Plaintiff engaged in conduct protected under ELCRA, including, but not limited to filing complaints, grievances, emailing command, filing an MDCR/EEOC charge, testifying at his arbitration hearing and notifying the City, through counsel, of his intent to pursue civil rights claims, which consisted of complaining of, reporting, and/or opposing the discriminatory and/or retaliatory conduct of the agents, servants, and/or employees of Defendant DPD.

154.    Under information and belief, subsequent harassing and arbitrary treatment Plaintiff experienced following his protected activity was meant to intimidate and deter him from making further or formal complaints of harassment, specifically from all individually named Defendants.

155.    Defendant DPD, including the above-named individuals, had knowledge of Plaintiff's protected activities.

156.    Defendant DPD, by and through its agents, servants, and/or employees, subsequently took adverse, retaliatory action against Plaintiff including, but not limited to, bringing disciplinary actions without cause, harassing him, transferring him to a less-favorable unit that would stymie his career advancement, selectively monitoring him, denying meritorious transfers to other blue-slip units,  and denying Plaintiff conditions, terms, opportunities, and privileges of his employment because he engaged in the above referenced statutory protected activities in violation of ELCRA.

157.    Defendant DPD and its agents, servants and/or employees' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

158.    Defendant's subsequent retaliation resulted in Plaintiff's reasonable and foreseeable medical leave of absence.

159.    As a direct and proximate result of Defendant's unlawful and retaliatory actions against Plaintiff as described herein, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity, loss of career opportunities, loss of reputation and esteem in the community, mental and emotional distress, and loss of the ordinary pleasures of life.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant, jointly and severally in an amount that is fair and reasonable and compensates Plaintiff for his injuries, plus costs, interest, and attorney fees, as well as punitive and/or exemplary damages so wrongfully incurred.

Respectfully submitted,

CHRISTENSEN LAW

BY: _____
MICHAEL W. LAURILA (P86937)
CHRISTENSEN LAW
Attorney for Plaintiff
25925 Telegraph Road, Suite 200
Southfield, MI 48033
(248) 213-4900/(248) 213-4901 (fax)
mlaurila@davidchristensenlaw.com

Dated: June 4, 2025

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOSHUA FELIX,

     Plaintiff,

Case No.

vs.

CITY OF DETROIT; MICHAEL
MCGINNIS; MARC DELUCA;
WILLIAM SIMS; JAMES WHITE;

     Defendants.

_____

## DEMAND FOR JURY TRIAL

     **NOW COMES** Plaintiff, JOSHUA FELIX, by and through his attorneys, CHRISTENSEN

LAW, and hereby demands a trial by jury in the above-captioned cause of action.

          Respectfully submitted,

          CHRISTENSEN LAW

BY: _____
          MICHAEL W. LAURILA (P86937)
          CHRISTENSEN LAW
          Attorney for Plaintiff
          25925 Telegraph Road, Suite 200
          Southfield, MI 48033
          (248) 213-4900/(248) 213-4901 (fax)
          mlaurila@davidchristensenlaw.com

Dated: June 4, 2025